## Case No. 16,129.

**UNITED STATES v. The RECORDER.**

[1 Blatchf. 218;[1] 5 N. Y. Leg. Obs. 286; 17 Hunt, Mer. Mag. 394.]

Circuit Court, S. D. New York.　July 2, 1847.

NAVIGATION LAWS — IMPORTATIONS OF COLONIAL PRODUCTS—CONSTRUCTION OF STATUTES.

1. The construction of the navigation act of March 1, 1817 (3 Stat. 351), is no longer an open one to the United States. The contemporaneous construction of the act, corroborated by an undeviating usage of thirty years, must now govern.

[Cited in Barney v. Leeds, 51 N. H. 266. Cited in brief in Burritt v. Commissioners of State Contracts, 120 Ill. 322, 11 N. E. 181.]

2. Therefore, as the United States have never, since the act of 1817, questioned importations of colonial products made in vessels of the mother country from her home ports, and as the secretary of the treasury, within six months after the passage of the act, instructed the collectors of the customs that the act allowed such importations, which instructions remained unaltered for twenty-five years, *held*, that the United States cannot now insist that the act does not allow the importation from London into New-York, in a vessel owned by British subjects residing in England, of goods, the growth, production or manufacture of the British East Indies.

3. If it were doubtful whether the trade in question was allowable under the act, or even if the intention of the act to the contrary were manifest, the contemporaneous exposition by the government, followed the concurrent practical construction, ought to govern.

4. But that construction was a correct one, and the act does not compel the productions or manufactures of the dependencies of Great Britain out of Europe, to be imported in vessels belonging to the place of production or manufacture.

5. The word "country" in the first section of the act, means the entire nation, and not merely a section or portion of territory belonging to the nation.

6. The act has in view foreign governments and nations, and their vessels, and not the localities within which the individual owners reside.

7. Nor does the act exact a direct trade from the port of production or of usual shipment, when the importation is in a vessel belonging to the country in which the goods are produced.

8. It does not appear that Great Britain prohibits the importation in vessels of the United States, of the productions of our territories or dependencies, shipped from a port of the United States to which they had been transported from the place of production.

9. Nor does it appear that vessels of the United States are prohibited by the British government from importing into this country from England, goods, wares or merchandise, the growth, production or manufacture of her East India dependencies.

This was a libel of information, which charged that the ship Recorder, not being a vessel of the United States, nor a foreign vessel truly and wholly belonging to the citizens or subjects of the British East Indies, on the 22d of May, 1847. imported from London into New York, various goods described. being the growth, production or manufacture of the British East Indies, from which place they had usually, since March, 1817, been shipped for transportation; by reason whereof, and by virtue of the act of congress of the 1st of March, 1817, the said ship, her tackle, &c., and the said cargo, became and were forfeited to the United States, and prayed process and a decree of condemnation, &c.

The claimants, averring themselves to be natural born subjects of the queen of Great Britain and Ireland. and resident in England, within the United Kingdom, pleaded specially to the libel, that the said ship, at the time, truly and wholly belonged to them, and still did; that the British East Indies were, at the time, provinces of, and part and parcel of the United Kingdom of Great Britain and Ireland, and of her majesty's dominions; and that the said goods were the growth, production and manufacture of the dominions of her majesty, and were received by them on board said ship, at the port of London, for transhipment to the port of New York; and averred their right to make such importation. The United States demurred to the special pleas, and the claimants joined in demurrer.

Benjamin F. Butler, U. S. Dist. Atty.

Francis B. Cutting, for claimants.

BETTS, District Judge. The question raised by the issue of law is, whether the trade in which this ship was employed, is inhibited by the act of congress "concerning the navigation of the United States," passed March 1, 1817 (3 Stat. 351).

The first section of the act provides "that after the thirtieth day of September next, no goods, wares, or merchandize, shall be imported into the United States from any foreign port or place, except in vessels of the United States, or in such foreign vessels as truly and wholly belong to the citizens or subjects of that country of which the goods are the growth, production, or manufacture; or from which such goods, wares, or merchandize can only be, or most usually are, first shipped for transportation: Provided, nevertheless, that this regulation shall not extend to the vessel of any foreign nation which has not adopted, and which shall not adopt a similar regulation." The second section declares that the vessel and cargo coming into the United States in violation of those provisions, shall be forfeited.

It is not stated in the pleadings, nor was it admitted by the claimants on the argument, that Great Britain has adopted regulations similar to those established by this act; and the claimants, therefore, in strictness of law, may be entitled to the objection that the construction insisted on by the government does not bring the vessel and cargo within the condemnation of the statute. We think, however. that if the navigation laws of Great Britain, notoriously restraining the trade in American vessels with her colonies, within limits more strict than the regulations of this

1 [Reported by Samuel Blatchford, Esq., and here reprinted by permission.]

statute, are not to be judicially noticed by the court, the provisions of the convention between the United States and Great Britain, of the 3d of July, 1815, must be regarded as part of the law of the case; and, in that convention, Great Britain reserves to herself, and adopts, by implication, regulations similar in this respect to those established by the act of congress in question. 8 Stat. 228.

It is admitted by the pleadings, that goods, wares, and merchandize, the growth, production or manufacture of the British East Indies, have, since the passage of the act of congress, been usually shipped for transportation from the ports of the East Indies. The district attorney, on the part of the government, accordingly contended, that the course of trade attempted in this instance, is prohibited to British vessels, first, by the direct language of the act of congress, and secondly, by its intent and policy, as gathered from antecedent and contemporaneous facts leading to its enactment.

We think, upon general principles of law, that the question as to the construction and bearing of the act of congress, in this respect, is no longer an open one to the government. In September, 1817, on transmitting the act to the officers of customs throughout the United States, the secretary of the treasury instructed them that "the term 'country,' in the first section, is considered as embracing all the possessions of a foreign state, however widely separated, which are subjected to the same executive and legislative authority. The productions and manufactures of a foreign state, and of its colonies, may be imported into the United States, in vessels owned by the citizens or subjects of such state, without regard to their place of residence within its possessions."

This exposition of the act does not appear to have been called in question or doubted by the United States until the 30th of June, 1842, when an opinion was given by the attorney general as to its meaning and operation, which, on the 6th of July, 1842, was transmitted by the secretary of the treasury to the collectors of the customs. The secretary, in his circular, instructs the collectors to be governed thereafter by the opinion of the attorney general, and "to take care that the penalties of the law are enforced in all cases coming under its provisions." The seizure in the present case is made in execution of those instructions. The attorney general intimates that the language of the first section of the act is not entirely free from ambiguity, but declares his opinion to be, "that it does not in any case authorize an indirect carrying trade by foreign ships." He says: "The proviso was intended to restrain the privilege extended to foreign vessels in the enacting clause. By this they are allowed, where they belong wholly to the citizens or subjects of that country of which the goods are the growth or manufacture, to bring these goods into our ports. By the proviso, this is confined to cases where a reciprocal privilege of the same kind is extended to our vessels." This interpretation of the act is entitled to the highest respect, and if we regarded it as removing or meeting the difficulties raised on this issue, we should give it the most careful consideration. We should probably feel considerable hesitancy in accepting, as the true key to the interpretation of the act, the idea put forth in the opinion, that the enacting clause extended a privilege to foreign vessels, and that the proviso confined it to cases where a reciprocal privilege of the same kind was extended to our vessels. It rather appears to us, that the natural reading of the act gives it a retaliatory and prohibitive character, restrained by the proviso from being enforced against any nation not having adopted like prohibitions or restrictions against the United States. But we forbear an examination of this point, because the case submitted to the attorney general had none of the features marking this. That was the case of a Belgian vessel which imported into the United States a cargo from Buenos Ayres, the product of the latter country; and the question to be decided was whether such indirect trade was open to her in articles of foreign growth or production. The attorney general was of opinion, that the act of the 1st of March, 1817, did not authorize it. The case would have been apposite, if the Belgian ship had been laden, at her home port in Europe, with productions of a Belgian colony or territory in the East or West Indies or in Africa, and if the United States were debarred from importing the same goods, except directly from the place of their production. There is no evidence before us that the treasury department, or the officers of the customs, have, since the act of 1817, arrested or questioned importations of colonial products, made in vessels of the mother country, from her home ports; and we must regard the contemporary exposition of the act given by the secretary of the treasury as the one acquiesced in and put in practice by the government from that period, except in the instance above referred to; and there is no evidence before us, that the attorney general's interpretation has ever been enforced in a case similar to this.

We hold the government, if not all other parties, to be now precluded, by that long usage and practical construction of the law, from questioning its correctness and disturbing the course of its execution. Admitting that, on the face of the act, it is doubtful whether the trade now attempted to be prosecuted can be allowed; or even conceding that the intention of the statute to the contrary is manifest, and that the treasury department misapprehended and misinterpreted its provisions, in the instructions of September, 1817, we think the settled rules of law, and the principles governing the interpretation of human language, with whatever solemnity and to whatsoever purpose it is employed, require us to adopt

and adhere to the contemporaneous construction, corroborated by an undeviating usage of thirty years, as that which must be applied to the statute and govern the case. We deem it unnecessary to state arguments or to analyze cases supporting this proposition. The principle is recognized and illustrated by the highest legal authorities. Dwar. St. 693; Bac. Abr. "Statute," I, 5; 3 Pick. 517. The supreme court of the United States has given the most solemn sanction to the doctrine, in declaring that a contemporary exposition of the constitution, practised and acquiesced in for a period of years, fixes its construction (Stuart v. Laird, 1 Cranch [5 U. S.] 299), and, in pronouncing the practical construction of a statute, to be the one which must be enforced, although clearly unauthorized by the terms of the law itself (McKeen v. Delancy's Lessee, 5 Cranch [9 U. S.] 22). In the first case, the period of acquiescence had been comparatively of short duration—about twelve years. The supreme court of Massachusetts, in a case most maturely considered, held that "a contemporaneous, is generally the best construction of a statute. It gives the sense of a community. of the terms made use of by the legislature. If there is ambiguity in the language. the understanding and application of it, when the statute first comes into operation, sanctioned by long acquiescence on the part of the legislature and judicial tribunals, is the strongest evidence that it has been rightly explained in practice. A construction under such circumstances becomes established law." Packard v. Richardson, 17 Mass. 144; Rogers v. Goodwin, 2 Mass. 477.

The navigation law, adopted by congress in 1817, would be one eminently calculated to attract the notice of the business community. It provided for cases of deep public moment; and most especially has it tended to meet in some degree the embarrassment which our trade suffered from the navigation laws of Great Britain, and from her commercial regulations affecting intercourse with her colonies. These had been topics of agitating interest in the negotiations between the two countries preceding the war of 1812, and in those leading to the termination of that war and the adjustment of new relations of peace. The Fourteenth congress, which came into power with the close of the war, must have been strongly imbued with the common tone of feeling, and familiar with the state of those commercial regulations as enforced by Great Britain and with their effect upon the interests of the United States. The president, in his message to congress on the 3d of December, 1816, adverted in strong language to the state of trade with the British colonies out of Europe, its partial and injurious bearing on our navigation, and the refusal of that government to negotiate on the subject. The merchants of New-York and Portland mem-

orialized congress on the subject, urging that importations of goods, &c., into the United States, should be prohibited, "except in vessels of the United States. or in vessels built by, and actually belonging to the citizens or subjects of the nation in which such articles have been produced or manufactured, &c." 11 Niles' Register (2d Sess.) 273; 14th Cong. Doc. No. 81.

It is not supposable, that in this aroused state of public opinion, the exposition placed by the secretary of the treasury on the act of March, 1817, could escape the notice of the executive and legislative branches of the government, and of the community at large; and that construction, therefore, under those circumstances, stands augmented with presumptions supporting its justness, stronger in force than even the lapse of thirty years' acquiescence. It is not to be credited that the president, congress, and the whole body of merchants, would permit an interpretation of the statute, which failed to carry out the spirit and meaning of its enactment, to govern our trade and revenues and it is difficult to put a case where contemporaneous construction could, with more confidence and justness, be relied upon as the expression of the true meaning of a law.

We feel, therefore, that we could, with great propriety, rest the decision of this case upon the application of that principle. as recognized and enforced in the authorities referred to, and supported by the special circumstances surrounding this law. But in a case presenting a question of grave import to our own mercantile interests, and also to the relations between the United States and Great Britain, we have considered it proper to examine with attention the statute itself, aided by the arguments of the respective counsel, and shall proceed to assign briefly the reasons leading us to the conclusion that the construction heretofore adopted is correct and should still be adhered to.

It seems to be maintained on the part of the United States, that the act should be understood to restrain the importation by British vessels, to articles, the production or manufacture of her European possessions, and to compel the productions and manufactures of her dependencies out of Europe, to be brought here in vessels belonging to the place of production or manufacture. This construction is founded upon the assumed import of the term "country." employed in the act, in connection with the supposed policy of the statute to establish a condition of reciprocity in respect to the navigation and trade of the country, where that was not already regulated by the convention of July 3, 1815.

It may be admitted that the term "country," used in the act, in its primary meaning, signifies place, and, in a larger sense, the territory or dominions occupied by a community, or even waste and unpeopled sections

or regions of the earth; but its metaphorical meaning is no less definite and well understood, and, in common parlance, in historical and geographical writings, in diplomacy, legislation, treaties, and international codes, not to refer to sacred writ, the word "country" is employed to denote the population, the nation, the state, the government, having possession and dominion over the country. Thus Vattel says: "The term country seems to be well understood by everybody. However, as it is taken in different senses, it may not be unuseful to give it here an exact definition. It commonly signifies the state of which one is a member." "In a more confined sense, this term signifies the state, or even more particularly the town or place of our birth." Vatt. Law Nat. bk. 1, c. 9, § 122. "When a nation takes possession of a distant country and settles a colony there, that country, though separated from the principal establishment or mother country, naturally becomes a part of the state, equally with its ancient possessions. Whenever, therefore, the political laws or treaties make no distinction between them, every thing said of the territory of a nation ought also to extend to its colonies." Id. bk. 1, c. 18, § 210. The whole of a country possessed by a nation and subject to its laws, forms it territories; and it is the common country of all the individuals of the nation. Id. bk. 1, c. 19, § 211.

It is very apparent, upon the provisions of the act of 1817, that congress understood and used the term "country" in the enlarged sense given by Vattel. Thus "nation," in the proviso to section 1, "foreign prince or state" in section 3, and "foreign power" in section 4, all represent, in their connection, the same idea as "country" in the first section. The special designation of "citizens or subjects," does not mark with more precision that the law had reference to political powers and agencies, than does the mere word "country,"—the thing containing, being, by a familiar form of speech, used for that which it contains: and besides, persons could, with no propriety of language, be styled "citizens or subjects of a country," without understanding "country" to mean the state or nation, and not merely a section or portion of territory belonging to the nation. So, in the preamble to the convention of 1815, "countries," "territories" and "people," are used by the two governments as having one import; and, in the first article, "territories" is employed as the correlative of "inhabitants." Other instances are frequent in our statutes and treaties and diplomatic correspondence, in which foreign countries and territories are referred to as the people, state or nation, occupying and governing them.

But, in the present case, it seems to us that the phraseology of the first section of the act, indicates, more distinctly even than the use of the ordinary word "country," that the regulation had a view to foreign governments and nations, and their vessels, and not to the localities within which the individual owners might reside or where the vessels might be employed. The expression of the law is: "In such foreign vessels as truly and wholly belong to the citizens or subjects of that country of which the goods are the growth, production or manufacture." It has been shown that, by the well known principles of public law, colonies are parts of the dominion and country of the parent state, and the inhabitants are her subjects and citizens. It follows, as a necessary consequence of that relationship, that there can be no citizens or subjects of the colonies, as distinct and separate from the mother country, and that they can possess no shipping, which, in its character, ownership or employment, will be foreign to other nations, in any sense other than as belonging to their common country. By the English law none but vessels wholly owned by British subjects resident within the British dominions, can be registered. Holt, Shipp. c. 2, §§ 3, 5; Wilk. Shipp. 240, 248. Congress thus most manifestly had reference to the nationality of vessels in the designation of them as "foreign," because the vessels must truly and wholly belong to citizens and subjects,—terms necessarily importing a state or government to which such owners appertain. This consideration, furthermore, supports the interpretation placed by the court upon the word "country," for the term is introduced into this law in connection with expressions demonstrating that the shipping interest and products of foreign states were in contemplation, and not merely the parts or places where the products were grown or the ship owners resided.

The "Act to Regulate Trade in Plaster of Paris," passed March 3, 1817 (3 Stat. 361), strongly imports that the navigation act of the 1st of March, was intended to have application to the foreign state, and not to any of its particular members or parts, and is a significant exposition of its scope and purpose, as viewed by congress. The two enactments were of a kindred character in their subject matter, and the later one, if not both of them, was in effect aimed at the restrictions of the British navigation laws. There were circumstances in the regulation of the Nova Scotia plaster trade, particularly offensive to this country, and congress, two days after enacting the law in question, passed a special act providing: "That no plaster of Paris, the production of any country, or its dependencies, from which the vessels of the United States are not permitted to bring the same article, shall be imported into the United States in any foreign vessel." [3 Stat. 61.] It is to be remarked upon this statute, that it was wholly supererogatory, if the construction now claimed on the part of the United States for that of the 1st of March, is correct; because the interdiction of the prior law, being universal, would necessarily include this particular description of importation in foreign vessels, it being denied in return to vessels of

the United States. A strong presumption is thus afforded that congress did not intend, by the act of the 1st of March, to exact and enforce a reciprocity of privileges with foreign vessels, in the trade to and from foreign countries, in the sense of giving our vessels the right to bring foreign products from any port of a foreign country, from which the vessels of that country might import them. It denotes, moreover, that congress considered it necessary to designate dependencies as places of production, when it was intended to discriminate them from the mother country; and also impressively shows, that congress understood the antecedent act as authorizing the importation of plaster of Paris in foreign vessels, from countries and their dependencies from which the vessels of the United States were not permitted to bring the same article. That such was the understanding and aim of congress is more distinctly manifested by the act passed the succeeding session, and which will be adverted to hereafter.

The grievance under which our navigation labored was, clearly, not the carrying trade of the East India colonies of Great Britain, nor the direct trade between them and the United States. Those subjects were embraced in the then recent convention of 1815, and we had given and accepted stipulations regulating both. We yielded to Great Britain the exclusive right, as to us, to carry on the coasting and foreign trade to and from those dependencies, expressly agreeing that the vessels of the United States should not carry any article from the ports to which they were admitted, to any port or place except to some port or place in the United States where it should be unladen. Convention of July 3, 1815, article 3. In the message of the president to congress, and the memorials of merchants, before cited, no reference was made to British regulations of the East India trade, as injurious to us or objectionable. Nor was it suggested that the carrying trade of Great Britain from her colonies was cause of complaint on our part, further than that it indirectly aggravated the injury of our exclusion from the direct trade. But what Mr. Madison and the merchants pointed to as oppressive to our navigation, was its total exclusion from a direct trade with the colonies. The president said: "The British government enforcing now, regulations which prohibit a trade between its colonies and the United States in American vessels, whilst they permit a trade in British vessels, the American navigation suffers accordingly; and the loss is augmented by the advantage which is given to the British competition over the American, in the navigation between our ports and the ports in Europe, by the circuitous voyage enjoyed by the one and not enjoyed by the other." Message, Dec. 3, 1816. This wrong, of course, was committed in respect to other dependencies of Great Britain than the East Indies; for, the second

section of the retaliatory act of April 18, 1818 (3 Stat. 432), specially passed to countervail the English colonial navigation laws (14 Niles' Reg. 111), saves all the provisions of the convention of July 3, 1815.

Congress, in the first measure adopted, seems to have stopped at the point of restriction to which our trade had been subjected by foreign powers, and to have intended the law to be applicable to all nations with whom we had commercial intercourse. They in substance adopted the English navigation act of 12 Car. II. c. 18. Reeves, Shipp. pt. 1, p. 107; 1 Chit. Commer. Law, c. 6. It was notorious that the operation of the act of March 1, 1817, under its proviso, would in effect be limited to British navigation. That this act was not designed to meet the mischiefs suffered by our trade under the regulations of the British colonial policy, is, therefore, indicated plainly by the subsequent act of March 3, 1817, and appears to us to be demonstrated by the provisions of the act of April 18, 1818, before referred to, and the two acts supplementary and in addition thereto, passed May 15, 1820, and May 6, 1822 (3 Stat. 602, 681). These statutes, containing the most rigorous inhibitions on the introduction, directly or indirectly, of the productions of British colonies into the United States, in British vessels, when not allowed to be imported in return with equal privileges in vessels of the United States, are plainly limited to the British West India and North American dependencies. Rep. of Comm., 11 Niles' Reg. 111. We think these various enactments, made under the suggestion of the executive, at the instance of our shipping merchants, accompanied by earnest diplomatic efforts and expostulations, in respect to the trade with the English dependencies in North America and the West Indies, conclusively support the meaning originally applied to the act of March 1, 1817, and which we adopt,—that it does not render illegal the trade attempted in this instance.

We perceive nothing in the provisions of the second clause of the first section of the act of March 1, 1817, bearing upon this question. The information avers that the productions of the East Indies have usually been first shipped for transportation from the ports of the East Indies, and the plea in substance admits the fact. Yet, as already indicated, the act, in our judgment, does not exact a direct trade from the port of production or usual shipment, when the importation is in a vessel belonging to the country in which the goods are produced. It places no limitation of place upon her right to bring the productions of her own country. If a foreign ship were to engage in such carrying trade, the act might probably require that her voyages should be from a home port, which should also be the country from which such goods, wares or merchandize can only be, or most usually are, first shipped for transportation. But we do not undertake to define the effect

or application of this clause, further than to say, that it does not restrain the exportation, in vessels owned by citizens or subjects of the country, to the port of production or usual shipment in that country.

We are also led to observe upon the proviso, that it does not appear from the pleadings, or any regulations of trade made by Great Britain which we have examined, that she prohibits the importation, in vessels of the United States, of the productions of our territories or dependencies, shipped from a port of the United States to which they had been transported from the place of production. Nor does it appear that vessels of the United States are prohibited by the British government, from importing into this country from England, goods, wares or merchandize, the growth, production or manufacture of her East India dependencies. As already intimated, therefore, there is ground for doubt, whether, upon the construction of the act assumed on the part of the government, a case is made showing any violation of its provisions by the importation in question.

Without adverting to many other topics of argument, opened by the case and discussed by counsel, the defence made by the special pleas is, in our judgment, a bar to the action; and the demurrers taken on the part of the United States must be overruled, and the vessel and her cargo be discharged from arrest and delivered up to the claimants.

[July 3, 1847. It being considered by the court, that the matter specially pleaded by the claimants to the libel and information filed in this cause, amounts in law to a bar thereof, and to the prosecution aforesaid for the matters in the said libel specified,—it is ordered by the court, that judgment be rendered for the claimants. upon the demurrer interposed on the part of the plaintiff to the plea aforesaid. It is further ordered by the court, that the said ship, her tackle, apparel and furniture, and the cargo in the pleadings specified, be discharged from arrest in this cause, and be delivered up to the claimants therein.] [2]

[Subsequently the collector of the port of New York made an application for a certificate of reasonable cause of seizure. The court decided that he was entitled to the certificate. although there had been laches in making application for the same. Case No. 16,130.]